UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA


      -v-                              20 CR 163 (S7)(PKC)


THOMAS GUIDO III,

        Defendant.
-------------------------------------------------------------X


# SENTENCING MEMORANDUM
# ON BEHALF OF DEFENDANT
# THOMAS GUIDO III


Joseph R. Corozzo
Rubinstein & Corozzo, LLP
*Attorney for Thomas Guido III*
260 Madison Avenue, 22d Fl.
New York, NY 10016
(212)545-8777 (ph)
(917)722-8206 (fax)

## <u>TABLE OF CONTENTS</u>

I.   Preliminary Statement ....................................................................................... 2

II.   Plea Agreement and Guideline Offense Level .................................................... 2

III.   This Court Should Impose a Non-Guideline Sentence ....................................... 3

   A.   18 U.S.C. § 3553(a) Sentencing Factors .................................................... 4

   B.   18 U.S.C. §3553(a)(1) ................................................................................ 5

     1.   The Nature and Circumstances of the Offense ..................................... 5

     2.   The History and Characteristics of the Defendant ............................... 7

       a.   His Childhood and Family Circumstances ......................................... 7

       b.   Golden Shoe Training Center ............................................................. 8

       c.   Medical Condition -- ▮▮▮▮▮▮ ......................................................... 10

       d.   Post-Arrest Life ................................................................................ 12

       e.   Conclusion ........................................................................................ 13

     3.   18 U.S.C. § 3553(a)(2)(A) .................................................................. 14

       a.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense ......... 14

       b.   To Afford Adequate Deterrence to Criminal Conduct ..................... 14

         (1)   General Deterrence ...................................................................... 14

         (2)   Specific Deterrence ..................................................................... 16

       c.   To Protect the Public from Further Crimes of the Defendant ........... 17

       d.   To Provide the Defendant with needed […]  Medical Care or Other Correctional Treatment in the Most Effective Manner ................... 17

      e.   The Need to Avoid Unwarranted Sentence  Disparities Among Defendants with Similar  Records Who Have Been Found  Guilty of Similar Conduct ................ 19

        (1)   Richard Banca ............................................................................. 19

        (2)   The *Navarro* Trainers, 20 Cr. 160 (S6) (MVK) ....................... 20

IV.   CONCLUSION ............................................................................................... 22

## I.      **Preliminary Statement**

This sentencing memorandum and accompanying exhibits are submitted on behalf of Defendant Thomas Guido III ("Guido"), who is currently scheduled to be sentenced on November 17, 2022 for Drug Adulteration and Misbranding in violation of 21 U.S.C. §§ 331, 333(a)(2) and 18 U.S.C. § 2.

We believe that a careful weighing of all the 18 U.S.C. § 3553(a) sentencing factors supports the imposition of a non-Guidelines sentence substituting home detention for imprisonment.

## II.     **Plea Agreement and Guideline Offense Level**

On May 25, 2022, Mr. Guido pled guilty before Your Honor to a one count Superseding Information, (S7) 20 CR 163 (PKC), in which he admitted to misleading and deceiving state and federal regulators with respect to the distribution, purchase and receipt of misbranded and adulterated drugs used to improve the performance of standard bred racehorses.  (PSR ¶¶ 1-2). His guilty plea was the result of a written plea agreement executed on May 20, 2022, in which Mr. Guido stipulated to applicable Guideline offense level of 19, Criminal History Category I, with a resulting Sentencing Range of 30 to 36 months.[1]  Mr. Guido's offense level of 19 includes a 14-level enhancement under U.S.S.G. §2B1.1(b)(1)(k) because the intended loss amount was greater than $550,000, but less than $1,500,000.

---

[1] The guideline range of imprisonment is capped at 36 months by 21 U.S.C. § 331's statutory 3-year maximum term of imprisonment.

The Probation Department's calculation of his Guideline offense level matches that of the plea agreement. (PSR ¶¶ 33-43, 46). Mr. Guido also agreed to forfeit $61,800.97 at sentencing.[2]

In addition to stipulating to a Guideline offense level of 19, both the government and Mr. Guido agreed not to seek an adjustment of his Guideline offense level at sentencing. (PSR ¶ 5(C)). However, the agreement left both parties free to seek a sentence outside of the stipulated Guideline Range based upon 18 U.S.C. § 3553(a) sentencing factors. (*Id.*)

### III.   <u>This Court Should Impose a Non-Guideline Sentence</u>

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory. A district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested" and "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 49-50 (2007). Therefore, while a district court is required to "begin each sentencing evaluation with a proper calculation of the guideline range"; it is also obligated to weigh the factors listed in section 3553(a). *United States v. Corsey*, 723 F.3d 366, 375 (2d Cir, 2013) <u>citing</u> *Rita v. United States*, 551 U.S. 338, 351 (2007).

The government, the defendant and the Probation Department all agree that Mr. Guido's total Offense level on the Sentencing Guidelines is level 19, criminal history category I, which results in an advisory range of incarceration of 30 to 36

---

[2] Counsel has the full forfeiture amount in his IOLA account and will produce a check at sentencing.

months.  The Probation Department recommends a custodial sentence of 24 months, 1-year supervised release, $10,000 fine and the agreed upon forfeiture of $61,800.97.  (PSR, p.23, 25).  It based its recommendation for a 6-month variance on the following grounds: (1) Mr. Guido's positive adjustment to pretrial services supervision, (2) his physical health ailments, and (3) that he "may be viewed less culpable than his co-defendants based upon the respective loss amounts in the scheme." (*Id.* at p. 24-25).

We contend that, after careful weighing of the relevant section 3553(a) factors, the Court should impose a non-guideline, non-custodial sentence of 12-months home detention.

**A. 18 U.S.C. § 3553(a) Sentencing Factors**

Title 18 of the United States Code, Section 3553(a) provides in pertinent part, the factors a district court considers in imposing a sentence, including:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training; medical care or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentences and the sentencing range established [under the applicable Sentencing Guidelines];
(5) any pertinent policy statements;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution of any victims of the offense.

18 U.S.C. § 3553(a).

**B.  18 U.S.C. §3553(a)(1)**

**1.  The Nature and Circumstances of the Offense**

Mr. Guido pled guilty to participating in a scheme to obtain and use misbranded and adulterated drugs, without a proper prescription, for the purposes of improving the performances of some of the standard bred race horses under his care. We do not seek to minimize the seriousness of his offense or deny his culpability for the charged conduct; but we do ask that the Court take notice that while Mr. Guido assisted others, on at least two occasions, to procure Epogen prescriptions from Grasso, he did not use Epogen on his horses.

He did use an all-natural supplement called "EPO Equine" on some of the horses in his care, which is mischaracterized as a powdered form of Epogen in his PSR.  (PSR ¶ 24).   It is not.[3]  In its response to our objection, the government maintained that whether the powder was derived from Epogen or an all-natural supplement was irrelevant because the purpose of the power was to act as a blood builder for a "performance enhancing effect."  (PSR, p.21).  That may well be true for the purposes of a misbranding charge; however, we believe that Mr. Guido's refusal to use actual Epogen demonstrates his genuine concern for the horses under his care.   Nevertheless, Mr. Guido did engage in conduct that, in hindsight, was not always in the best interest of horses.

---

[3] See Exhibit A-, an email from Adam Murray of Pacesetter Tack and Supply describing (1) where Mr. Guido purchased the product and (2) a description of the product.  EPO Equine by Biomedical Research Labs is not derived from Epogen and a description of the product can be found at https://brlequine.com/pages/epo-equine.

On September 20, 2022, the government represented to the Court that Mr. Banca was the only defendant in this case that had "any horse death associated with their doping conduct." (Docket No. 270-1, p. 20). Yet, in its sentencing submission for co-defendant Louis Grasso, the government suggests that Mr. Guido was directly responsible for the death of a horse under his care. (Docket No. 276, p. 5). The basis of this allegation is a conversation between Dr. Grasso and Mr. Guido recorded on October 2, 2019, in which they discuss the death of a horse owned by a friend of Mr. Guido. Dr. Grasso, who did not examine the horse, opines that the horse died of an improperly administered N-Butyl injection.

The horse named Reiki (it is incorrectly identified in the government's transcript as Rankie) died the day before on October 1, 2019 after a race at Poconos Downs in Pennsylvania. In the ordinary course of harness racing, a horse must be at the track at least 4 hours before post time, and N-Butyl, which acts as a blood clotting agent, to be effective, must be administered between 1 - 2 hours before a race. Mr. Guido was not present at that race, he did not transport that horse to the track, and it's not clear whether Reiki was stabled at Golden Shoe.[4] Mr. Guido did not mis-deliver an injection of N-Butyl to Reiki on October 1, 2019.

Yet, throughout the conversation, Dr. Grasso refers to the person that injected Reiki as "you" presumably meaning Mr. Guido – and Mr. Guido does not correct him, even though it could not have been him because he was not present in

---

[4] The owner moved his horses back and forth between stables in Buffalo, New York nearer to his home and the Golden Shoe. Mr. Guido never trained Reiki, who was purchased on 9/22/19, ten days before his death.

Pennsylvania when the injection was administered.   The entire conversation is speculative – neither Dr. Grasso or Mr. Guido have any actual knowledge of what happened to Reiki –  we don't know why the horse died.[5]  What is true, however, is that similar to his facilitating others in obtaining Epogen prescriptions, Mr. Guido may have supplied the N-Butyl that Dr. Grasso had prescribed for his barn.  It is conduct that he deeply regrets.

### 2.  The History and Characteristics of the Defendant

#### a.  His Childhood and Family Circumstances

Thomas Guido III was born on ███████ 1965, in Auburn, New York.  He was raised in a loving home by his parents Thomas, Jr. and Nancy, along with his siblings Frank and Angela. His childhood was fairly unremarkable until his brother Frank was diagnosed with Hodgkin's Lymphoma in 1985.  Mr. Guido was attending college at the time, but decided to put school on hold so that he could donate bone marrow to his brother.  Tragically, Frank was killed in a car accident before the procedure was performed. Mr. Guido never returned to college.  (PSR ¶¶ 51-52). After leaving school, Mr. Guido worked full time for his father's business, Tom's Auto in Auburn, New York.  (PSR ¶ 72).

In 2020, Thomas, Jr. passed away after suffering a stroke and Mr. Guido assumed the mantle as "head of the family."  (Exhibit B, Letter of Marie Bauso). He and his sister share an exceptionally close relationship since Frank's death.

---

[5] It is standard practice for horseracing commissions to order a necropsy when a horse dies at a racetrack. We have not been provided a copy of that report.

(Exhibit C, Letter of Angela Guido).   His sister Angela remembers how "Tommy" stepped in when her husband was diagnosed with ███████ by moving them into his own home and driving them into the city for ████████. (Exhibit C).  She is also financially dependent on him and relies on him to help care for their elderly mother.  *Id*.

According to his aunt Marie Bauso, Mr. Guido is "the rock" that she and their family rely upon.  (Exhibit B).  She worries that "[i]f Tom were not around, it would cause a hardship for the whole family he holds so dear.  It would not only be a financial hardship but also an emotional one."  *Id*.

### b. Golden Shoe Training Center

While he was working with his father, Mr. Guido fell in love with harness racing and, in 1999, began to train horses for himself.  (PSR ¶ 71).  He did not earn a profit.  (*Id*.)  In 2007, Mr. Guido made a career change; he stopped working in the auto sales industry and purchased Golden Shoe Training Center ("Golden Shoe") in Montgomery, New York.  (PSR ¶ 70, 72).  The training center is 129 acres and consists of several barns and residential properties – Mr. Guido rents stall space to other trainers and/or horse owners.  (PSR ¶ 55).

Golden Shoe was not just a business enterprise for Mr. Guido, it was a realization of all of his hopes and dreams and he worked hard to create a thriving community.  He cared about his tenants and his employees.  David Russo, a longtime friend and tenant, describes the type of farm owner Mr. Guido is:

> he has lowered or eliminated stall rent for myself and
> others that were struggling or just starting out in the

> horse racing business and needed a break to 'get things
> rolling.' When I moved to Bullville NY from Hamburg in
> 2013, I had a 5-month-old baby and my wife with me, Tom
> didn't charge me stall rent or an apartment fee until I was
> able to pay.

(Exhibit D, Letter of David Russo.)  However, Mr. Guido did more than just offer

financial support, he encouraged David Russo to finish his education before he

entered the horseracing industry because, "an education would always be there [ ] if

other ventures did not work out."  (*Id*.)  David Russo did finish his education,

receiving a bachelor's degree in sociology, and is currently attending Erie County

Medical Center Police Academy.  (*Id*.)

Darrin Monti, a Board Member of Western New York Harness Horseman's

Association, who has known Thomas Guido for over thirty years and has at various

times in his career both driven and trained horses for him, describes Mr. Guido as

"the type of person who would always help someone who needs it.  He is the type of

man whom you could call any time of day or night and whom you know will be there

to help you no matter what the situation."  (Exhibit E, Letter of Darrin Monti).

Darrin's son Andrew describes Mr. Guido as a close friend who, at a time "when [he]

was struggling in New Jersey, Tom helped [him] by opening his home and taking

[him] in like [he] was family."  (Exhibit F, Letter of Andrew Monti).

Mr. Guido's willingness to help others extends to his employees as well,

especially those who came to the United States for a better life.  Jose Godinez has

known Mr. Guido for 17 years, first as an employee, but now as a friend and Jose

Godinez credits him for the successful life he has built.  According to Jose Godinez,

Mr. Guido was instrumental in his obtaining American citizenship by helping him study and providing employment, assisting his parents gain green cards, and even offering to house his siblings.  (Exhibit G Letter of Jose Luis Godinez.)  Mr. Guido even "vouched for [Godinez's] youngest brother co-signing a loan so [his brother] could purchase a home for his wife and three children."  (*Id*.)

Miguel Alejo, another former employee, also submitted a letter to the Court in support of Thomas Guido, in which he describes Mr. Guido as both "a friend and a father figure."  (Exhibit H, Letter of Miguel Alejo).  Miguel Alejo describes how Mr. Guido impacted every aspect of his life by mentoring him and providing him the opportunity and encouragement to work, get an education, and "be somebody and live a life worth living."  (*Id*.)  According to Miguel Alejo, who is currently in the process of gaining American citizenship, Mr. Guido "was very understanding and considerate when [he] needed to leave early or needed time off for school for anything to do with immigration," including offering financial assistance to pay for Mr. Alejo's legal bills.  (*Id*.) He believes, that "[i]f it weren't for [Thomas Guido], [he] would have ended up in jail or even worse dead due to the dumb choices [he] made in life, but Thomas always had [his]back and showed [him] to do the right thing." (*Id*.)   In short, Mr. Guido taught Mr. Alejo, a kid born in Mexico, that the American Dream was possible for him to achieve.  *Id.*

### c.  Medical Condition – ██████████

Four years after purchasing the farm, Mr. Guido's life was changed forever when, on June 1, 2011, he ████████████████████████.  ██████████████████████



▮▮▮▮▮▮▮▮▮▮. (Exhibit B). ▮▮▮▮▮▮▮▮▮▮ As luck would have it, Dr. Grasso called him early that morning and Dr. Grasso instantly recognized that ▮▮▮▮▮▮▮. Dr. Grasso called 911. He helped save Mr. Guido's life that morning and Mr. Guido remains indebted to him.

Mr. Guido was subsequently diagnosed with ▮▮▮▮▮▮▮,

According to Mr. Guido's primary care physician,



### d. Post-Arrest Life

His arrest and the COVID-19 pandemic have dramatically impacted Mr. Guido's life.  As a consequence of his arrest and subsequent guilty plea, he is banned from horse racing, in any capacity.  COVID-19, as it has for most of the

---

[8]

world, devastated his business at the farm.  Mr. Guido needed to re-invent himself

professionally to earn a living.  Fate intervened when Mike LoPiccolo, the owner of

LoPiccolo's Auto Group, a car dealership in Auburn, New York, reached out to Mr.

Guido after hearing of his father's death.  (Exhibit L, Letter of Michael LoPiccolo).

According to Mr. LoPiccolo, his family owned and operated business was dying and

he hoped that Thomas Guido could help save it.  *Id.*  And, in his words:

> My family knows that [Thomas Guido] has broken the
> law, but we know more importantly that his daily efforts
> for our business have saved all of us from
> unsurmountable hardship.  His loyalty to his friends &
> family is very heartwarming.  I know that his mother
> survived his father, and she loves & needs him in her life
> like we do.  His absence will undoubtedly cause us to
> either close our doors or sell the business.

*Id.*

### e.  Conclusion

Thomas Guido is described by those who know him as a man that is generous

with both his time and his money; a man concerned about the well-being of others;

and a man devoted to his friends and family.  He believes in the American Dream,

which includes assisting immigrants on the path to American citizenship and

promoting the importance of higher education.

And although the government will surely contest it, he is also described as

being kind to the horses under his care, providing them with the best food and, even

assuming the care of retired racehorses he has been unable to rehome as pets.

(Exhibit G, Exhibit M).

Mr. Guido's history and characteristic favor the imposition of a non-guideline sentence.

### 3.  18 U.S.C. § 3553(a)(2)(A)

18 U.S.C. § 3553(a) directs a court to "impose a sentence sufficient, but not greater than necessary, to comply with purposes set forth in paragraph (2)." Paragraph (2) of the statute lays out four separate purposes for the sentencing statute, each are detailed below.

> **a.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The Probation Department has taken into account the need for Mr. Guido's sentence to reflect the seriousness of the offense, promote respect for the law and to provide just punishment, and has concluded that a non-Guidelines sentence will be sufficient but not greater than necessary to fulfill these goals. (PSR, p. 24).

### b.  To Afford Adequate Deterrence to Criminal Conduct

### (1) General Deterrence

In its letter submitted for co-defendant Richard Banca's sentencing, the government argued a Guideline Sentence was "necessary to afford adequate general deterrence." (Docket No. 263, p.5).  The government pointed to the "all too many actors in the racehorse industry" who have "grown indifferent to, and dismissive of, the notion of obtaining illegal drugs to dope racehorses." *Id*. "A Guideline Sentence," they concluded "will serve to counter the pervasive view in the racehorsing industry that administering PEDs is inconsequential and that such criminal activity will

never amount to significant criminal penalties." (Id. at 5-6.) In other words, the government appears to acknowledge that (1) this is a widespread problem within the horseracing community and (2) that it is "under-prosecuted."

"The theory of general deterrence is that imposing a penalty on one person will demonstrate to others the costs of committing a crime, thus discouraging criminal behavior." *United States v. Lawrence*, 254 F.Supp.3d 441, 442 (E.D.N.Y. 2017). The concept of general deterrence relies upon the assumption that people are rational actors. *Id.* at 443-44. However, most offenders do not act rationally and criminological research has found that "enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment." (Valerie Wright, Ph.D., "Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment," *The Sentencing Project* (Nov. 2010); available at: https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf; *See also*: National Institute of Justice, *Five Things about Deterrence*, p.5 (June 2016) ("it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment."); available at: https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

In *Lawrence*, Dr. Jeffrey Fagan testified as an expert witness "challenging the assumption that a longer term of incarceration will necessarily have a general deterrent effect on future gun crimes;" 254 F.Supp.2d at 443. While *Lawrence* involved a crime of violence, the reasoning is applicable – Dr. Fagan testified that it

is "the degree of certainty" that an individual will be arrested and prosecuted, as opposed to the length and severity of punishment, that motivates people. *Id*. at 446-447.  The Court agreed and ultimately, after reviewing all of the sentencing factors, imposed a 30-month sentence (an 11-month variance from the low end of the Guidelines).  As the Court succinctly stated, "[t]he key to both general and specific deterrence is the known risk of detection and punishment, not the length of the sentence." *Id*. at 447.

Here, if the horseracing doping problem is as widespread as the government alleges, imposing a Guideline Sentence on a single defendant will not send an effective message to those wrong doers. Instead, more vigilant policing of the horseracing industry that increases the likelihood that an offender will be caught is a better, more effective, means of deterring horse doping.

### (2) Specific Deterrence

Absent this case, Mr. Guido has led a law-abiding life.  His single prior arrest occurred in 1986 when he was 20 years old and happened shortly after the death of his brother.  He recovered from his mis-step and built a successful life.

The instant offense is directly tied to Mr. Guido's involvement in the horse-racing industry.  He has been banned.  It is extremely unlikely that he will ever be able to obtain any horseracing related license in the future, thus the risk of him repeating his criminal conduct is negligible.

### c.  To Protect the Public from Further Crimes of the Defendant

We believe this factor is not relevant to his sentencing. Mr. Guido is 56 -years old, he committed a non-violent federal offense and has zero criminal history points. He is gainfully employed and a contributing member of society.

### d.  To Provide the Defendant with needed [...]  Medical Care or Other Correctional  Treatment in the Most Effective Manner

Mr. Guido suffers from ██████████████████████ *supra* pp. 6-7. ██

███████████████████████████████████████████████

████████████████████ (Exhibit K). ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████

████████████████████████████████████████████

█████████████████████████████ We are now two-and-one-half years into the global pandemic, and we now know that COVID-19 causes blood clots and devastating strokes in otherwise healthy, younger patients.  *See*, "In Covid-19 Positive Stroke Patients, More Severe Strokes, Worse Outcomes than in Covid-19 Negative Patients (Mount Sinai, December 2020); available at: https://www.mountsinai.org/about/newsroom/2020/in-covid19positive-stroke-patients-more-severe-strokes-and-worse-outcomes-than-in-covid19negative-patients-pr; *see also*, "Covid-19 Increasing Stroke Risks in People of All Ages,"



(University of Utah Health, January 2022) ("Researchers are still studying the cause of the increased risk. But doctors know that COVID-19 causes an inflammatory response that thickens a person's blood. Thicker blood is more likely to clot, and clots can lead to stroke. Many of the young people who suffer a stroke after a COVID-19 diagnosis have few (and sometimes no) risk factors normally associated with stroke."), available at:

https://healthcare.utah.edu/healthfeed/postings/2022/01/covid19-increasing-stroke-risks.php.

Mr. Guido has followed every CDC recommendation to avoid COVID-19 infection, including ██████████████████████, quarantining, masking and social distancing.  To date, he has successfully avoided contracting the virus, ███ ████████████████████████████████████  While the threat of exposure to COVID-19 has diminished somewhat within the Federal Bureau of Prisons, it is still present in virtually all its facilities according to the daily updates posted by the BOP (available at: https://www.bop.gov/coronavirus/).

The global pandemic exposed, as it did in almost all facets of the American health care system, how precarious health care is in the BOP. ██████████ ████████████████████████████████████ ████████████████ ███████████████████████ ███████████████████. ██████████████████ ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████.

We submit that █████████████████████████████

████████████████████████████████████████████

████████ this factor supports the imposition of a non-guideline, non-custodial

sentence.

### e. The Need to Avoid Unwarranted Sentence  Disparities Among Defendants with Similar  Records Who Have Been Found  Guilty of Similar Conduct

In its sentencing recommendation, the Probation Department recognized that

one of the factors the Court should consider is that Mr. Guido, as compared to his

co-defendants, "may be viewed as less culpable" based on their respective loss

amounts and his lack of a leadership role in the offense.

### (1) Richard Banca

At the time of filing of this Memorandum, only co-defendant Richard Banca

has been sentenced by the Court.  Your Honor imposed a non-Guideline sentence of

30-months custody, followed by 1-year supervised release and a $10,000. fine.[9]  Mr.

Banca's total Offense level was 29, with a corresponding sentencing range of 87-108

months, his guideline calculation included:  a loss amount of between $9.5 million

and $ 25 million, and an enhancement for leadership role in the offense.  (Docket #

---

[9] The 30-month sentence imposed by Your Honor is 57-months less than the bottom
of Mr. Banca's potential guideline sentence if there were no statutory cap.  Mr.
Guido's potential guideline sentence range (30-37 months) falls mostly below the
statutory cap.

260 and 263).  However, similar to Mr. Guido, Mr. Banca's term of imprisonment was capped at the statutory maximum of 36-months.

The Probation Department, "while being mindful of unwarranted sentencing disparities," still recommended a 6-month variance from the bottom of Mr. Guido's guideline range.  (PSR, p. 24).  Given that Mr. Guido's conduct was less culpable than his co-defendants, as measured by his guideline offense level, his significant medical issues, and the fact that Mr. Banca also received a non-guideline sentence, we respectfully submit that the need to avoid unwarranted sentencing disparities weighs in favor of a non-guideline sentence for Mr. Guido below the 30 months imposed on Mr. Banca.

## (2) The *Navarro* Trainers, 20 Cr. 160 (S6) (MVK)

To the extent that the Court looks to the sentences imposed by Judge Vyskocil in *United States v. Navarro, et al.*, 20 Cr. 160 (S6) (MVK), there are significant differences between Mr. Guido's conduct and the actions of the *Navarro* trainers, which favor a lesser sentence for Mr. Guido.

Jorge Navarro, described as a "prolific doper of racehorses" who was "notable in his aggressive pursuit of novel drugs to administer to the racehorses under his care and control" received a term of 60-months imprisonment.  (*Navarro*, 20 Cr. 160-MKV, ECF No. 920, p. 5).  His sentence, which was capped at the statutory maximum, resulted in a sentence that was 108-months less than the bottom of his applicable Guideline Range of 168 to 210 months' imprisonment.

Christopher Oakes's Guideline Range was 46 to 57 months and according to the government he "procured adulterated and misbranded performance enhancing drugs [ ] re-distributed those drugs to Navarro, produced his own drench that was purportedly untestable even when administered the day of a race, which he administered to his own racehorses and provided to Navarro."  (*United States, v. Navarro*, Docket No. 20 Cr 160-MKV, ECF No. 920, p.4).  Oakes was an active participant in Navarro's doping program, as well as his own, and he "assisted Navarro in surreptitiously administering drugs to one of Navarro's racehorses, "XY Jet" the day the horse was scheduled to race."  (*Id.*)  His offense conduct spanned approximately one year. Judge Vyskocil sentenced Oakes to the statutory maximum of 36 months' imprisonment, which was 10-months below his applicable guideline range.

Marcos Zulueta's Guideline Range was 33 to 36 months (the plea agreement had a guideline range of 30 to 37 months based on an erroneous calculation of Zulueta's Criminal History Category; the court determined his guideline range to be 33 to 36 months).  (*Navarro*, 20 Cr 160-MVK, ECF No. 809, p. 20). Zulueta was a trainer, actively involved with Navarro's extensive doping program, as well as operating his own extensive doping program. (*Navarro*, 20 Cr 160-MVK, ECF No. 773, pp. 2-7).  Judge Vyskocil found his conversations with Navarro to be,

> frankly shocking and egregious at the level of callousness
> that I see in the dialogue back and forth between the two
> of them. At times it appears that Mr. Zulueta was
> actually educating Mr. Navarro about new and
> experimental ways to drug horses and telling him --
> telling Navarro -- about the need to be careful to hide

what they were doing so that they would not be caught by
drug enforcement and horse racing authorities.

(*Navarro*, 20 Cr 160-MVK, ECF No. 809, 25-26).  The scale of Zulueta's doping

program far exceeded Mr. Guido's conduct and is of a much different character.  He

received a guideline sentence of 33-months' incarceration.

Rick Dane, Jr., another trainer, received a sentence of 30-months'

imprisonment, which was 16-months less than the bottom of his Guideline Range of

46 to 57 months.

## IV.    CONCLUSION

It is respectfully submitted that the preceding analysis of the 3553(a) factors,

including subsection (2), support the imposition of a non-guidelines sentence for Mr.

Guido.   He deeply regrets his offense, which has forced him to leave a profession he

truly loved.  While his unlawful conduct was serious, it does not present a full

picture of who he is.  He has led an otherwise law-abiding life, giving freely to his

friends, neighbors and family and helping those in need.  And incarceration

presents a unique threat to his life ███████████████████████████████████

███████████████████████████████████.

For all the foregoing reasons, we respectfully request that the Court impose a

non-guideline sentence of 12-months home detention.

Dated:  New York, NY                                   Respectfully submitted,
         November 3, 2022

                                                       */s/ Joseph R. Corozzo*
                                                       Joseph R. Corozzo
                                                       Rubinstein & Corozzo, LLP
                                                       *Attorney for Thomas Guido III*

260 Madison Avenue, 22d Fl.
New York, NY 10016
(212)545-8777 (ph)
(917)722-8206 (fax)

cc:    Clerk of the Court (Via ECF)

       AUSA Sarah Mortazavi (Via ECF & email)